NOTICE

Decision filed 03/31/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200140-U

NO. 5-20-0140

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| CHARLES RAY DURHAM, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 18-MR-130 |
| | ) | |
| ALLISON VIRGINIA DURHAM and | ) | |
| CHARLES RICHARD DURHAM, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| (Allison Virginia Durham, Defendant-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where Allison Virginia Durham owed a fiduciary duty to Charles Ray Durham, we conclude that the trial court's judgment that Allison failed to rebut the presumption of fraud is not contrary to the manifest weight of the evidence. Where evidence supported the trial court's conclusion that Allison was Charles's "caregiver," as defined in the Presumptively Void Transfer Act (755 ILCS 5/4a-5(1) (West 2018)), and where the transfer document and fair market value elements were also supported by evidence, Charles's quitclaim deed transfer of his home to Allison was presumptively void. We affirm the trial court's order holding that the December 23, 2016, quitclaim deed was void based upon Allison's breach of her fiduciary duty and because the transfer violated the Presumptively Void Transfer Act.

¶ 2   Charles Ray Durham's wife, Ruby, needed assistance with various aspects of day-to-day life. Additionally, Charles and Ruby needed assistance with their financial transactions. Allison

1

Virginia Durham was married to Charles and Ruby's son, Charles Richard Durham (Rick). Rick and Allison offered to assist Ruby and Charles. Allison did not live in the immediate area but came to Charles and Ruby's home over weekends. Ruby passed away on December 17, 2016. Rick and Allison stayed with Charles immediately after Ruby's death. Six days after her death, Charles met with an attorney and executed a quitclaim deed that added Rick and Allison to the deed to the marital home and the approximate 40 acres of land where the home was located. In April 2018, Charles challenged this transfer in court, alleging a breach of a fiduciary duty and a violation of the Presumptively Void Transfer Act. Following a bench trial, the trial court entered its judgment in Charles's favor. For the reasons that follow in this order, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. The Complaint

¶ 5     On April 19, 2018, Charles filed his complaint against Rick and Allison. As the case proceeded in the trial court, Charles filed an amended complaint on July 31, 2018, and then a second amended complaint on April 26, 2019. Charles's second amended complaint contained four counts. The second amended complaint was the complaint at issue at trial.

¶ 6     In count I, Charles alleged that Allison breached her fiduciary duty pursuant to a power of attorney he had granted her. Charles claimed that Allison's breach of fiduciary duty came at a time when he was suffering tremendous mental anguish because his wife of 64 years, Ruby, had recently passed away. He alleged that this breach caused him to execute the quitclaim deed conveying a joint interest in his house and property to Rick and Allison.

¶ 7     In counts II and III, Charles alleged that he had a safe in his home that contained $11,000 in cash and that Rick and Allison had a key to the safe. Charles was hospitalized, and upon his return to his house, he ascertained that the $11,000 was missing. He claimed that because Rick and

2

Allison were the only parties who had a key to the safe, that Rick and/or Allison must have stolen the money.

¶ 8 In count IV, Charles alleged that Allison was his caregiver at the time he executed the quitclaim deed. He stated that Allison frequently traveled to Carbondale to help him. As Allison is not a family member as defined under the Presumptively Void Transfer Act, Charles claimed that the quitclaim deed transferring property into Allison's name is presumptively void.

¶ 9                                         B. The Trial

¶ 10 The case proceeded to a bench trial on December 13, 2019. Numerous witnesses testified and the trial judge viewed Charles's April 5, 2019, evidence deposition. We will summarize the relevant testimony and exhibits introduced into evidence.

¶ 11                             1. Testimony of Dan Vaughn

¶ 12 Dan Vaughn is Charles's nephew. Dan's mother is Charles's sister. Dan testified that he visits Charles every few days. Dan further testified that while Ruby was alive, Rick and Allison would drive down to Charles's home to care for Ruby and Charles. The family had agreed that Allison should serve as Charles's power of attorney. He testified that Rick and Allison were going through a divorce at the time of the trial.

¶ 13 Dan first learned of the quitclaim deed in November 2017. At that time, Charles, who had been in a four-wheeler accident, was in a rehabilitation facility. Charles asked Dan to retrieve his cell phone from the home and bring it to the facility. Dan contacted Allison to see if she knew where Charles's cell phone was located in the house. Dan testified that at that time, he learned from Charles's neighbor that Rick and Allison had changed the locks on Charles's home. Rick obtained the new key from the neighbor and accessed the home to retrieve Charles's cell phone.

3

¶ 14    Dan testified that on November 8, 2017, Charles revoked Allison's power of attorney because of the unauthorized change of locks and appointed Dan as his power of attorney. Dan then wrote a letter to Charles's children informing them that he would not accept any income or gifts from Charles for serving as his power of attorney, and he had the letter notarized. Two months later, Charles named his other two children—Vickie Lewis and Kevin Durham—as his power of attorneys.

¶ 15    Dan stated that Allison drove down to Charles's house in November 2017 and had the locks changed a second time. Charles's daughter, Vickie, who lived next door, saw Allison's vehicle parked at the house. Vickie told Dan that she went over to investigate, and when she asked about the change of locks, Allison informed her that she and Rick owned the house.

¶ 16    Dan testified that in addition to the transfer of title to the house, Rick and Allison had applied for new vehicle titles on Charles's three vehicles and on Charles's fifth wheel trailer. Dan testified that he did not know why Allison was retitling the vehicles but explained that she had placed one of Charles's vehicles in her own name. Furthermore, Allison had gone to the local post office and arranged for all mail to be forwarded to her home address. After Dan became Charles's power of attorney, he revoked the mail forwarding order. However, after two or three days, Allison had arranged again to have Charles's mail forwarded to her. Finally, Dan testified that Allison had written out a $500 check to herself from Charles's account, indicating on the memo that the check was for vehicle insurance. However, Dan testified that he had questions about the check because he believed that the check should have been made payable to the insurance company instead of to Allison if the check was intended to pay for vehicle insurance.

¶ 17    Finally, Dan testified that he believed that Allison took advantage of Charles and got him to quitclaim the property to Rick and her. He testified that when Charles was released from the

4

rehabilitation facility, he asked Dan, Vickie, and Kevin to retrieve his safe. Inside the safe were important legal papers. Charles indicated that he also kept cash in the safe, but the cash was not there. Dan testified that he did not know about the safe until Charles asked him to retrieve it. He assumed that Rick and Allison had access to it, but he did not know if anyone else had the ability to access it. Dan acknowledged that he had no personal knowledge that the safe once contained money.

¶ 18                              2. Testimony of Kevin Durham

¶ 19    Kevin testified that he is Charles's son, and a brother to Rick and Vickie. He testified about the long marriage Charles and Ruby had before she died.

¶ 20    On January 5, 2018, Charles granted Kevin a power of attorney over his finances. From his father's September 2017 bank statement, Kevin identified a transaction where Allison had withdrawn $500 from Charles's account in cash. Kevin testified that he did not know the reason for Allison's withdrawal. He also identified a check dated August 13, 2015, in which Charles purchased a used 2000 Ford Ranger truck from the Auffenberg Chrysler dealership in Herrin for $4500. Kevin also identified a vehicle title for the Ford Ranger truck dated September 4, 2015, in Allison's name. He testified that he did not know why the truck was titled in Allison's name. Kevin then identified two checks written out of Charles's checking account to Allison as follows: a check dated September 13, 2015, for $545 and signed by Allison with "Ford Ranger Ins." listed in the memo line of the check; and a check dated August 15, 2015, for $5025, signed by Charles with "home care service—June, July, and August" listed in the memo line of the check. In cross-examination, Kevin testified about a third check made payable to Allison and dated August 13, 2015, for $4500. However, that document was not entered into evidence during the trial.

5

¶ 21    Kevin testified that he believed that Charles was vulnerable in late December 2016 when he executed the quitclaim deed adding Rick and Allison as joint owners. He stated his belief that Allison manipulated Charles into executing the deed. According to Kevin, Charles had always wanted to hand his house and land down to his children. He testified that his father would want to have the property returned.

¶ 22                              3. Testimony of Charles "Rick" Durham

¶ 23    Rick Durham testified that he was Charles's son, and that his wife, Allison, went to Charles's home monthly, staying a few days to assist his parents with household chores and daily living tasks. He indicated that Allison would help bathe and dress his mother when she stayed at Charles's home.

¶ 24    Rick testified that the night before Charles signed the quitclaim deed—December 22, 2016—Rick heard Allison and Charles talking at 9:30 p.m. when he retired for the evening. Then, Rick woke up at approximately 1:30 a.m. on December 23, 2016, and he heard Allison and Charles still talking. The next morning, Allison and Charles were up before Rick and were eating breakfast at about 7 a.m. Rick testified that Charles left to go to the funeral home, where an attorney was scheduled to meet him, to sign the quitclaim deed at about 8:30 a.m.

¶ 25    On cross-examination, Rick acknowledged that on the morning of December 23, 2016, he did not hear Charles or Allison talk about the deed. However, he testified that Allison telephoned the attorney who would prepare the quitclaim deed. Rick testified that he reminded her that they had both been told by the funeral director that they were not supposed to contact Charles's attorney. He acknowledged that he did not overhear her conversation with the attorney.

¶ 26    Rick testified that he knew that Allison assisted with Charles's finances, but he did not know any details. He explained that most of her work with the finances took place after Ruby died.

6

¶ 27 Later in the trial, Rick was called by his attorney to testify about Charles's safe. He testified that he was familiar with the safe. He further testified that he never removed anything from the safe, and never directed anyone else to take items from the safe. He testified that while he had never seen Allison possessing a large amount of cash, as they were now in the midst of a divorce, he had learned of accounts that she had opened in her own name. On cross-examination, he testified that he had no personal knowledge that any money was taken from the safe but that he felt that Allison was capable of taking the money Charles claimed he had stored in that safe.

¶ 28                    4. Testimony of Timothy Todd Russell

¶ 29 Timothy Todd Russell testified that he is employed as a funeral director by Wilson McReynolds Funeral Home in Marion, Illinois. Russell's memory was not definitive, but he testified that at some point after Ruby's funeral, Charles contacted the funeral home to indicate that he needed an attorney to assist with legal documents. Russell testified that someone at the funeral home had asked if Charles wanted to use an attorney who had worked in the past with funeral home clients, to which Charles answered in the affirmative. Russell testified that he was familiar with attorney Campbell Brown who had assisted funeral home clients with various legal matters. He stated that Charles and Brown agreed upon a date and time to meet and finalize the legal documents at the funeral home. On December 23, 2016, Russell reported to work and was informed that Charles and Brown needed him to be a witness to the legal documents that Brown had prepared at Charles's request. Russell testified that the document signing took place in the funeral home lounge. Charles, Brown, and Russell were the only three persons present.

¶ 30                    5. Testimony of Campbell Brown

¶ 31 Campbell Brown is a West Frankfort attorney whose practice is primarily based in the areas of estate planning and probate with some related real estate work. He would not provide any

7

testimony about the quitclaim deed or about his relationship with Charles, other than to invoke Rule 1.6 of the Code of Professional Conduct (Ill. R. Prof'l Conduct (2010) R. 1.6 (eff. Jan. 1, 2016)). Brown testified that he did not have an attorney-client relationship with Rick or Allison.

¶ 32                                   6. Testimony of Allison Durham

¶ 33    Allison testified that Charles was her father-in-law and that she had known him for 20 years. She testified that depending upon her schedule, she went down to help Ruby and Charles one to two times per month. The drive from Allison's home to Charles's Carbondale home took six hours. Allison testified that while she was there, she would accompany them, be their companion, help around the house, and provide hygiene care for Ruby. Allison denied that she was a "caretaker."

¶ 34    Allison confirmed that she became Charles's power of attorney. Although she was uncertain of the date, she estimated that it was sometime in November 2016. Prior to that time, Dan, Rick, Charles, and Allison discussed the issue, and it was determined that because Allison spent time caring for Charles, she should have that power. Allison denied that she ever used the financial power of attorney, noting that it was her understanding that she could only use that authority if Charles became incapable.

¶ 35    Allison also identified the quitclaim deed dated December 23, 2016. She testified that she did not remember staying up late to talk with Charles on December 22, 2016—the day before he signed the quitclaim deed. Allison additionally testified that she did not have any conversations with Charles about the deed, but she acknowledged that before he left to go sign the deed, she and Rick said to him, "Dad, this is your house. You do with it what you want. We don't need the money. We are financially secure. You do with it what you want. If you want to give it to charity, whatever you want to do." Allison testified that she thought that Charles would put the house in

8

Rick's name because at that time, Charles was not communicating with his other two children, Kevin and Vickie. She testified that she did not learn that her name was on the quitclaim deed until about three months later.

¶ 36   Allison testified that she did not know Charles's attorney. She claimed that she did not know that Charles was going to sign legal documents on December 23, 2016, and testified that she had never seen nor spoken to Charles's attorney. On cross-examination on this issue, Allison denied that she or anyone else told Charles that he would lose his farm if he did not sign a deed. She also denied that she spoke with attorney Campbell on the phone.

¶ 37   Allison indicated that she knew the combination of the safe. She also knew where the key to the safe was kept. She testified that she had opened the safe at some point in time but denied that she had ever seen cash inside.

¶ 38   Allison testified about the $5025 check that Charles had written out to her. She explained that as Ruby's health was declining, Charles and Ruby had learned that they would not be entitled to Illinois state aid because they had too much money in the bank. She testified that she suggested that Charles write her the check, which she cashed, and then immediately handed the cash back to Charles. Allison inferred that the purpose of the check was to reduce the assets so that Charles and Ruby would qualify for aid. After that statement, the trial court advised Allison that she had the right to exercise her privilege against self-incrimination of what appeared to be an attempt to defraud the state government. She continued to testify that the memo portion of the check indicated that the check was for home care services for the months of June, July, and August 2015. Allison denied that she ever received another check from Charles for services.

¶ 39   Allison also identified the title to the 2000 Ford Ranger that was in her name. She testified that Charles paid for the truck. Allison explained that the decision to put the vehicle title in her

9

name was made because Charles was then involved in a lawsuit involving a motor vehicle accident, and they did not want the title to be in Charles's name. She testified that Rick suggested that the truck be titled in Allison's name. Allison insured the truck in her name, although she never had physical possession of it. The two checks made payable to Allison for $500 and then $545 represented insurance on the truck. Allison explained that she paid the insurance from her own funds and then reimbursed herself from Charles's account. On cross-examination, she confirmed that she had signed the title to the Ford Ranger over to Charles as part of another court case.

¶ 40    Allison testified that she was aware that Charles wanted his property back. However, she denied that she was "refusing" to give Charles his property back. Instead, she testified that she did not know that he had put her name on the deed. However, she acknowledged that as of the date of the trial she had known for more than one year. Allison stated that she was aware that Rick had offered to give up his share in Charles's home.

¶ 41    Allison confirmed that she and Rick told Charles that they did not need to be added to the deed because of their financial situation. However, Allison testified that "circumstances have changed." When asked if she believed she was entitled to own the property, Allison avoided giving a direct answer. Instead, she explained that she objected to signing away her rights to the property because after the four-wheeler accident "everything changed." She testified that after the accident Charles "believed the last person he spoke to." Allison stated that she believed that Dan is the person who got Charles to change his mind about the title to the property. She testified that Dan had started to be friends with Charles's daughter, Vickie, and that after Dan and Vickie got together, "they were conspiring against us." She testified that she "was there for [Charles and Ruby]" as a rationale for why she would not remove her name from the deed. However, she then denied that she was entitled to the property as repayment for the time she spent caring for them.

10

On redirect examination, Allison further explained that she felt that Dan and Vickie resumed their relationship with Charles after his accident because they believed he could die.

¶ 42    During cross-examination, Allison acknowledged that she had filled out the paperwork to have Charles's mail forwarded to her home. In explaining why she took this action, Allison testified that after Charles had his four-wheeler accident, "Dan, Rick and I and the neighbors had all worked very hard to help Charles get all of his finances in straight so he could stay in that house." During the time Charles was hospitalized, Allison had the neighbors picking up Charles's mail. In a conversation with one of the neighbors, the neighbor informed Allison that Dan retrieved the mail from them. In response, Allison testified that she was wondering "whose side" Dan was choosing, noting that they had worked well together in taking care of Charles and Ruby, but that after Charles had had his accident, Dan was suddenly "acting suspicious and wanting all this stuff." Then Rick and Dan "had words" over the phone. Allison claimed that she had never received Charles's mail pursuant to her forwarding order, and that after Rick and Dan fought, she contacted the Carbondale post office and instructed the staff to "return it back to normal delivery." Allison testified that she did not have Charles's permission to change the mail delivery, but she said that at that point when he was in the hospital, "he wasn't in his right mind." When asked, Allison admitted that she had not consulted with any of Charles's physicians about whether he had the ability to make his own decisions during his hospitalization.

¶ 43    Allison admitted that she had never paid real estate taxes or homeowners' insurance on Charles's home. She also admitted that she had never made any improvements or paid money for the property.

¶ 44    Allison was also asked about Charles's power of attorney. She testified that her friend notarized the document, and that Charles signed the document before she brought it to be notarized,

11

and so the document was not signed in the notary's presence. Allison then explained that she and Charles attempted to go to two locations known to have a notary in the Carbondale area, but the notaries were not present. She offered to take it to her friend and have it notarized, and Charles said that would be fine.

¶ 45 Allison testified that she, Rick, and Charles had a conversation with the funeral director about the deed to Charles's home. According to Allison's testimony, the funeral director told Charles that now that Ruby had passed away, he should add someone to his deed, or if "something" happened to Charles, his property would have to be probated. The funeral director then told Charles that he knew of an attorney that could provide assistance.

¶ 46 After the attorneys finished questioning Allison, the trial judge asked her questions for clarification. In response, Allison acknowledged that she participated in a conversation with Rick, Charles, and the funeral director that involved Charles's house and the need to place someone else's name on the deed. She acknowledged that her previous testimony denying there had been any conversation about the deed and the house was inaccurate. Allison reaffirmed that when Charles left to go sign the deed, she did not know that he was going to add her and Rick to the deed. The judge then asked Allison that if she did not know that Charles was going to add her and Rick to the deed, then why did she tell him before he departed that: "It's your property. You can do with it whatever you want. We don't need anything. We're well-off." Allison attempted to explain the inconsistencies in those two statements. She testified that she believed that Charles might put Rick's name on the deed, but that she had no belief that he would put her name on the deed.

¶ 47 The trial judge also asked Allison to clarify her statement that she needed to get into Charles's house after his four-wheeler accident "to protect everything I had done for Charles."

Allison testified that she was trying to protect the legal and financial work she had set up for Charles. When pressed about why that required her to climb through a window to get inside, Allison testified that she "wanted to protect and make sure that they didn't go in and take anything." The trial judge asked Allison who "they" were, and she responded that "they" were Charles's daughter, Vickie, and his nephew, Dan. Allison testified that at the time she arrived at Charles's house and climbed through the window, she was unaware that her power of attorney had been revoked.

¶ 48    Later in recross-examination, Allison admitted that she received a text message from Dan at 12:27 p.m. on November 9, 2017, indicating that her power of attorney had been revoked, which contradicted her earlier testimony. Allison testified that she called Rick to tell him about this revocation and informed him that she was driving down to Charles's house. Allison confirmed that she arrived at Charles's house that evening at 5 p.m., and she went to the neighbor's house to see if they had a key. Allison testified that the neighbor told her that Dan had the key and that Dan had informed them that he was the power of attorney. Allison confirmed that she had received a text message from Dan at about 3 p.m. informing her that the key to Charles's house would be at the nursing station of the residential facility where Charles was currently being rehabilitated. She climbed in through the window to retrieve her personal belongings and went into the safe and removed the title to the 2000 Ford Ranger. She testified that she did not go through any of the other legal papers in the safe and she did not know whether there was cash in the safe.

¶ 49    When asked on recross-examination why she took the title to the 2000 Ford Ranger which she had previously testified was Charles's truck, Allison testified that she took the title because the insurance was in her name and, therefore, she was liable for the truck. She attempted to explain that while she had no "trouble" signing the title to the truck over to Charles that she "just [didn't]

13

want him driving the truck with me being liable." However, she acknowledged that she did not immediately sign the title over to Charles.

¶ 50    The trial judge then asked Allison a series of questions about a November 13, 2017, order of protection document she signed under oath in Kane County. Allison filed an order of protection against Charles's daughter, Vickie, and asked the court to keep Vickie away from her and from her possessions. In response to further questions, Allison acknowledged that she had read the order of protection paperwork before she signed it and that she was aware that in signing the legal document that she was stating that all statements in the document were true and accurate. The order of protection sought protection of a 2011 GM Acadia Denali, the 2000 Ford Ranger truck titled in Allison's name, and a pontoon boat stored in Kane County. The judge confirmed that Allison was in possession of the 2011 GMC Acadia Denali. The judge asked Allison why she thought that someone was planning to take, damage, or hide the Denali from her. Allison was unable to answer the question and testified about her fear during the November 2017 incident in Charles's yard that Vickie would damage her vehicle while it was parked at Charles's house.

¶ 51    In response to additional questions, Allison acknowledged that she had been added as a signatory to Charles and Ruby's checking account before she was named as power of attorney and before Ruby passed away. Allison confirmed that Charles and Ruby had placed their trust in her with respect to their financial transactions before she was granted the power of attorney. Based upon the two checks that were exhibits, the trial judge deduced that Allison was a signatory on their bank account as early as 2015. Allison confirmed that she had been added as a signatory before the dates of those two checks but could not recall when that had occurred.

14

¶ 52                              7. Testimony of Crystal Durham

¶ 53   Crystal testified that Allison is her mother. She was 19 years old on the date of her trial testimony. She testified that she currently resides with her father, Rick. Crystal testified that she accompanied Allison on one of her caregiving visits. She stated that Allison helped with Ruby's medication and bathed her, as well as cleaned the house. Crystal also testified that Allison handled all financial matters for Charles and Ruby. She stated that her father, Rick, did not handle any of his parents' financial matters. Crystal further testified that Allison took medication that belonged to either Charles or Ruby.

¶ 54   Crystal testified that she and her father were unaware that Allison had driven down to Carbondale in November 2017—the day that she crawled into Charles's house through a window. Crystal also testified that on multiple occasions, Allison went down to Carbondale without informing her or Rick.

¶ 55              8. Evidence Deposition Testimony of Charles Durham

¶ 56   Charles was deposed on April 5, 2019. His attorney opted to utilize this videotaped deposition as opposed to having Charles testify at trial because Charles's memory had begun to falter. At the conclusion of the trial, the trial judge stated that he would review the video of Charles's deposition. We note that the record on appeal contains a physical transcript of the deposition, but not the actual video recording.

¶ 57   Charles testified that he was 90 years old as of the date of the deposition and that he had been married to Ruby for 64 years before she passed away. His education ended in the eighth grade. He and Ruby had three children—Rick, Kevin, and Vickie. Rick is married to Allison and they have a daughter named Crystal. Charles testified that Ruby's health declined over a span of

15

14 months. Charles experienced tremendous grief when she died, and he believed that someone could have taken advantage of him during that time.

¶ 58 Charles testified about the power of attorney document and about the quitclaim deed. He stated that Allison had a power of attorney document, but that it was not legal because "she had that made up *** north." Turning to the quitclaim deed, Charles testified that he did not know the attorney involved and did not contact him to set up an appointment. He testified that the appointment must have been set up by Rick or Allison. Charles said that on the day of Ruby's funeral, after they returned home, Rick and Allison told him that if he did not sign a legal document that he would lose his house, explaining:

> "So they made it appear that I still owed my funeral bill but I didn't. But in my mind I knew I had to pay for that but they kept telling me you would lose your place if you don't— so we made arrangements for you to meet—it was the next day now, made arrangements for you to be at this lawyer's office, lawyer at the funeral home, which that made me thinking I did owe the funeral home."

Charles testified that although the quitclaim deed states that he was paid $10 in consideration, he received no money from Rick or Allison.

¶ 59 Charles also testified about his safe, the missing money, money he gave to Allison, and other items he alleges that Allison removed from his house. He testified that "they" bought him the new safe with keys. Rick and Allison had a key to the safe. He claimed that he had $12,000[1] in the safe; $850 in his billfold; and $500 that he kept in a dresser drawer. He said that every time Allison came down to his house, he gave her $100. Charles alleged that Allison took the $500 from his dresser drawer, and he testified that she admitted to him that she stole the $500 and promised to pay him back. The $500 was stolen after Ruby died. Charles testified that Allison never paid

---

[1]While Charles testified that the amount of money he kept in the safe was $12,000, he alleged in his second amended complaint that $11,000 was stolen from his safe.

16

him back. He stated that he believed that Rick and/or Allison took the $12,000 out of his safe, but he acknowledged that neither had confessed to the theft. Charles also testified that he believed that Allison had stolen Ruby's $6300 diamond ring, and alleged that she stole many things from his house, including his bathroom scale.

¶ 60    Finally, Charles testified that he was afraid of both Rick and Allison. He testified that he wanted Rick and Allison to be removed from the deed to his house and property.

¶ 61                    9. Verified Petition for Order of Protection

¶ 62    We briefly review the allegations made by Allison in the Kane County verified petition for order of protection filed on November 13, 2017, that was entered into evidence as an exhibit, because the trial judge referenced and questioned Allison about the allegations she made in the petition. Allison sought an emergency order of protection against Vickie Lewis, Charles's daughter. She alleged that Charles was then in a rehabilitation facility recovering from injuries he sustained in a four-wheeler accident. "Since he has been injured, Allison believes that Vickie and her cousin Dan, have been conspiring to somehow obtain access to any money Charles might have." Allison alleged that Vickie and Dan were "up to no good."

¶ 63    Allison recounted the night that she drove down to Charles's house on November 9, 2017, when she entered the house by climbing through an unlocked window. Once inside the house, she called the locksmith to change the locks. Allison went outside to meet the locksmith and encountered Vickie, who allegedly got into an argument with her. Allison informed Vickie that she owned the house.  She alleged that Vickie has a "history of physical, mental, and verbal abuse," and alleged that she was afraid for her safety. Allison stated that "[s]he is afraid of what Vickie may do if she believes there is money to be gained from Allison or Charles's belongings. She is also afraid of what Vickie may do to Allison's belongings which are on Charles's property."

17

¶ 64 Allison asked the court to prohibit Vickie from entering or remaining at the Carbondale house. Allison asked that the court order Vickie not to "take, encumber, conceal, damage or otherwise dispose of" a white 2011 GMC Acadia Denali, a blue 2000 Ford Ranger, and a pontoon boat.

¶ 65                                    C. Judgment

¶ 66 The trial court noted that the execution of the quitclaim deed on December 23, 2016, at the Wilson-McReynolds Funeral Home was somewhat of a mystery. Because attorney Campbell Brown asserted his attorney-client privilege, no information was provided as to how attorney Brown—who had no computer, printer, or support staff at the funeral home—was able to have but one meeting with Charles at which he executed the quitclaim deed. As previously indicated, Charles testified that he had not set up the meeting with attorney Brown, and he suspected that Rick and/or Allison had done so.

¶ 67 The trial court reviewed the services Allison provided for Charles and Ruby, before noting that Allison testified that she was not functioning as their "caretaker." The court noted that there had been a check written out to Allison and signed by Charles with the memo indicating that payment was intended for three months of home care services and that Allison forwarded Charles's mail to her home.

¶ 68 While Charles had alleged that Rick and/or Allison had stolen money and other items from him, Rick and Allison had denied doing so. Crystal, the daughter of Rick and Allison, testified that Allison removed medication from Charles's home. Allison admitted that she climbed through a window to obtain access to Charles's home in November 2017, but claimed that she was simply retrieving her personal items. The trial court found that while there was evidence of opportunity,

18

there was insufficient evidence to support Charles's claim that Rick and/or Allison had converted $11,000 in Charles's cash.

¶ 69    The trial court found that the Allison violated the Presumptively Void Transfer Act, stating that in evaluating the live testimony of Rick and Allison as well as the video of Charles's evidence deposition, he found that Charles's testimony was more credible. The trial judge concluded that at a vulnerable time in Charles's life immediately after Ruby's funeral, Rick and Allison told Charles that he would lose his house if he did not modify the deed. The court indicated that while he would presume that attorney Brown advised Charles, the court had no proof that he did so because of his invocation of the attorney-client privilege. The court concluded, stating:

> "The evidence supports a finding that Ray [Charles] went to the meeting with Brown believing that if he didn't sign the deed, he would lose his home of 40 years which was purchased from Ruby's family. That false belief was implanted by Defendants. It was implanted with the intention of cutting [Charles]'s other heirs out of the real estate."

¶ 70    Finally, the trial court concluded that Allison breached her common law fiduciary duty in that on the date of the execution of the quitclaim deed, Allison held a power of attorney that the parties then believed was valid. The trial court rejected her defense that the power of attorney was invalid because Allison was responsible for any invalidity. The court explained: "It is inappropriate for the person who obtained the power to offer as a defense to an allegation of breach of fiduciary duty on her part that the power was invalid due to her own attempted fraudulent act (improper notarization)." Meanwhile, the court noted that Allison had no qualms about using the "powers" granted when she changed the locks on Charles's home, applied for new car titles, directed financial payments, and redirected Charles's mail to her home address. The court determined that the testimony at trial failed to rebut the presumption of fraud in that there was no support for the theory that Charles's actions were deliberate, voluntary, and of intelligent design. Furthermore, the trial court found that the record lacked evidence that Charles had competent and independent

19

advice, that Allison had made a frank disclosure to Charles, and that Allison paid adequate consideration. The court stated that the evidence, coupled with his assessment of the credibility of the witnesses, did not demonstrate by clear and convincing evidence that Allison acted in good faith and did not betray the confidence placed in her.

¶ 71 In ruling, the trial court declared the December 23, 2016, deed to be void and ordered it to be set aside. He ordered Rick and Allison to execute any documents necessary to effectuate this ruling.

¶ 72 Allison appeals from this judgment. Rick does not appeal.

¶ 73                                          II. ANALYSIS

¶ 74 Allison appeals from the trial court's judgment. She argues that the evidence admitted during trial was insufficient to establish that she breached her fiduciary duty, and that there was no violation of the Presumptively Void Transfer Act.

¶ 75                                          A. Fiduciary Duty

¶ 76 In a general sense a fiduciary is "a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires." Black's Law Dictionary 625 (6th ed. 1990). A fiduciary duty has been defined as "[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person." *Id.* A fiduciary duty is deemed to be the "highest standard of duty implied by law." *Id.*

¶ 77 The holder of a power of attorney over property has a fiduciary role to protect the principal party as a matter of law. *In re Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 25 (citing *In re Estate of Miller*, 334 Ill. App. 3d 692, 697 (2002)). After the power of attorney document has been executed, any transaction between the two parties that benefits the holder of the power of

attorney is presumptively fraudulent. *Id.*; *In re Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 69 (citing *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757 (1988)). The burden of proof then shifts to the dominant party to prove by clear and convincing evidence that the transaction was fair and equitable and did not result from his or her undue influence over the principal party. *Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 69 (citing *Lemp*, 170 Ill. App. 3d at 757). The following factors are used to determine if the person holding the fiduciary duty rebutted the presumption of fraud: " '(1) showing that, before the transaction, the fiduciary made a frank disclosure of all relevant information; (2) the fiduciary paid adequate consideration for the transaction; and (3) the principal had competent and independent legal advice.' " *Id.* (quoting *In re Estate of Teall*, 329 Ill. App. 3d 83, 88 (2002)).

¶ 78    After it has been determined that a fiduciary relationship has been established, the trial court must determine if that duty has been breached. The following four elements serve to establish a cause of action for a breach of a fiduciary duty: (1) a fiduciary duty existed between the plaintiff and the defendant; (2) the defendant owed a fiduciary duty to the plaintiff because of the defendant's fiduciary position; (3) the defendant breached her fiduciary duty; and (4) the breach proximately caused the injury to the plaintiff. See *Chicago City Bank & Trust Co. v. Lesman*, 186 Ill. App. 3d 697, 701 (1989).

¶ 79    In fiduciary cases, "[t]he trial court is in a superior position to hear and weigh the evidence and determine the credibility of the witnesses." *Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 38 (citing *Estate of Teall*, 329 Ill. App. 3d at 91). We will not disturb a judgment following a bench trial unless the trial court's judgment is clearly contrary to the manifest weight of the evidence. *Jackson v. Bowers*, 314 Ill. App. 3d 813, 818 (2000). A judgment is contrary to the

21

manifest weight of the evidence if the opposite outcome is apparent. *Comm v. Goodman*, 6 Ill. App. 3d 847, 853 (1972).

¶ 80    The difficulty with the facts in this case stems from the invalidity of the power of attorney document. All parties agree that Charles did not sign the legal document in the presence of a notary public, and that therefore, the power of attorney was never valid. Allison clearly utilized the powers that would have been granted in this document by changing the locks on Charles's house and having his mail forwarded to her house. Despite her utilization of the powers ostensibly granted to her by Charles, no fiduciary relationship existed as a matter of law because the power of attorney was not valid. However, that does not end the inquiry of this court.

¶ 81    When there is no fiduciary relationship as a matter of law, the party seeking relief has the burden to show the existence of a fiduciary relationship by clear and convincing evidence. *Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 32 (citing *In re Estate of Martino*, 99 Ill. App. 3d 907, 910 (1981)). Relevant factors to be considered in determining whether a fiduciary relationship has been established include: "the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of [his] business affairs to the 'dominant' party and placed trust and confidence in the 'dominant' party." (Internal quotation marks omitted.) *Id.*

¶ 82    In this case, the evidence at trial established that Allison was frequently at the home of Charles and Ruby to provide home and healthcare, and eventually to handle their business and monetary affairs. This relationship was longstanding—approximately 20 years in duration. Allison testified that she had always enjoyed a close relationship with Charles. We also know that there was an age difference between Charles and Allison. Charles testified that he was 90 in April 2019 when he was deposed, and so would have been in his late 80s when the relevant events

22

occurred in this case. However, Allison's age was not provided in her testimony. Similarly, we know that Charles only attended school through the eighth grade, while Allison's schooling was not referenced in her testimony. There was no specific evidence that Charles's health was in decline, until he suffered the four-wheeler accident which required a lengthy recovery and stay in a rehabilitation residential facility. By deciding that Allison should serve as his attorney-in-fact, Charles placed his faith and trust in her. In fact, according to trial testimony, other family members weighed in on the decision before concluding that Allison was the best choice to serve in this capacity. We concur with the trial court's conclusion that Charles established the existence of Allison's fiduciary relationship with ample evidence of their degree of kinship and that he entrusted Allison with his business affairs.

¶ 83    Once a fiduciary relationship has been established between the dominant and subservient parties, any transaction between those parties that benefits the dominant party is presumptively fraudulent. *Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 32 (citing *Lemp*, 170 Ill. App. 3d at 757). At this point, the burden of proof shifts to the dominant party to establish by clear and convincing evidence that the transaction was fair and equitable and not the result of the dominant party's undue influence over the subservient party. *Id.*

¶ 84    In this case, Charles testified that on the night that his wife of 64 years was buried, Rick and Allison informed him that if he did not add a name or names as owners of his house and property that he would "lose it." From Charles's testimony, it was clear that he was confused and grief-stricken and did not have a clear understanding of the reason he needed to transfer the property. While Rick and Allison offer slightly different versions of the events of that evening, Rick testified that he overheard Allison up late that night speaking with Charles. Rick also testified that the next day, he walked in on Allison having a telephonic conversation with the attorney's

23

office involved in the preparation of these documents. While both Rick and Allison testified that they did not know that Charles was going to add them to the deed to his house and land, those statements are inconsistent with their testimony that as Charles was departing the home, they repeatedly told him that they were well-off and did not need to be added to the deed. Also, the trial court expressly found that Charles's testimony was more credible than Allison's testimony. Furthermore, Charles testified that he did not know the attorney and did not believe that he had hired him. He had been directed to go to the funeral home and sign the documents. If attorney Campbell had provided additional information in his trial testimony, some of these questions may have been resolved. What is clear is that the statements made to Charles implying that he would lose his house if the house was not placed into a joint ownership with others was inaccurate. The evidence presented at trial supported Charles's theory that this misinformation was utilized to persuade him to make the transfer and was not a " 'frank disclosure of all relevant information.' " *Id.* ¶ 69 (quoting *Estate of Teall*, 329 Ill. App. 3d at 88). Furthermore, Allison paid no consideration for her co-ownership of the house and property. As the trial court found, we concur that there is no way to determine if Charles received competent and independent legal advice. We agree with the trial court's assessment that Allison did not rebut the presumption that the transaction benefiting her was fraudulent. *Id.*

¶ 85    We conclude that there was ample evidence supporting the trial court's conclusion that the quitclaim deed transaction was presumptively fraudulent and the result of Allison's breach of her fiduciary duty. We find support for the trial court's judgment because the court had the ability to assess each witness's credibility. Witness credibility was critically important in this case given the nature of the case's allegations and testimony provided in response. Accordingly, we affirm the trial court's judgment finding that Allison breached her fiduciary duty she owed Charles.

24

¶ 86                           B. Presumptively Void Transfer Act

¶ 87    The Presumptively Void Transfer Act, part of the Probate Act of 1975, took effect on January 1, 2015, and applies only to transfer instruments executed after the effective date. 755 ILCS 5/4a-35 (West 2018). The sections were designed to combat elder abuse. See Jeffrey R. Gottlieb, *A New Weapon Against Elder Abuse: Presumptively Void Transfers to Caregivers*, 103 Ill. B.J. 24 (Jan. 2015). If a transfer instrument is challenged in a civil action, there is a rebuttable presumption, with certain exceptions, "that the transfer instrument is void if the transferee is a caregiver and the fair market value of the transferred property exceeds $20,000." 755 ILCS 5/4a-10(a) (West 2018). The rebuttable presumption can be overcome in two situations: (1) where the transferee's share under the new transfer instrument is no greater than the share the transferee already had in a transfer instrument in effect before the transferee became a caregiver to the transferor; or (2) if the transferee proves "by clear and convincing evidence that the transfer was not the product of fraud, duress, or undue influence." *Id.* § 4a-15.

¶ 88    As outlined in section 4a-10(a), there are three elements necessary to conclude that a transfer is presumptively void: (1) a transfer instrument, (2) the transferee must be a "caregiver," and (3) the fair market value of the transferred property must exceed $20,000. *Id.* § 4a-10(a).

¶ 89    We first evaluate the transfer instrument requirement. A transfer instrument is defined as "the legal document intended to effectuate a transfer effective on or after the transferor's death and includes, without limitation, a will, trust, transfer on death instrument, deed, form designated as payable on death, contract, or other beneficiary designation form." *Id.* § 4a-5(3). The legal document at issue in this case was a quitclaim deed, and thus the quitclaim deed meets the definition of transfer instrument.

¶ 90    We next evaluate the "caregiver" requirement. The term "caregiver" is defined as "a person who voluntarily, or in exchange for compensation, has assumed responsibility for all or a portion of the care of another person who needs assistance with activities of daily living." *Id.* § 4a-5(1). The statute states that a caregiver "does not include a family member of the person receiving assistance." *Id.* The term "family member" is defined as including "a spouse, civil union partner, child, grandchild, sibling, aunt, uncle, niece, nephew, first cousin, or parent of the person receiving assistance." *Id.* § 4a-5(2). The question then is whether Allison was a "family member." The language of section 4a-5(2) of the Presumptively Void Transfer Act clearly does not exclude in-laws, and thus the transfer to Allison is presumptively void if she meets the definition of a "caregiver." See Jeffrey R. Gottlieb, *A New Weapon Against Elder Abuse: Presumptively Void Transfers to Caregivers*, 103 Ill. B.J. 24, 25 (Jan. 2015) (stating that individuals commonly considered to be family members, including in-laws, do not constitute family members as defined by the statute, and therefore fall within the statutes' purview).

¶ 91    We turn to the definition of a "caregiver" to determine if Allison served as Charles's caregiver. As Allison is not a "family member," the sole remaining issue is whether her role in Charles's care fits the statutory definition of a caregiver. The term is defined as follows: " 'Caregiver' means a person who voluntarily, or in exchange for compensation, has assumed responsibility for all or a portion of the care of another person who needs assistance with activities of daily living." 755 ILCS 5/4a-5(1) (West 2018). Based upon the testimony of multiple persons at trial, there is no question that Allison served as a caregiver for Ruby. However, because the quitclaim deed was not contemplated or planned until after Ruby's death, we find that it would be inappropriate to label Allison as a caregiver based solely on her prior care of Ruby.

26

¶ 92    We find that the issue is whether Allison served as Charles's caregiver both before and after Ruby's death. Did Allison assume responsibility for all or part of Charles's care? We find that the testimony at trial as well as the documentary exhibits entered into evidence amply establish that Charles was a person who needed assistance with activities of daily living and that Allison assumed responsibility for all or part of this care.

¶ 93    While there was no testimony that Allison engaged in any physical care with Charles, there was testimony that she cleaned the house as part of the care that she was providing to Charles and Ruby. In addition, Charles entrusted Allison with check-writing powers and with being his power of attorney on all matters, including property and health. Allison drove to a few businesses with Charles to find a local notary public to witness Charles's signature on the power of attorney document. Although the power of attorney was not legally binding because Charles's signature was not witnessed by a notary public, Allison behaved as if the power of attorney was legal and binding and continued to help Charles. There was testimony that she reviewed his various insurance policies, sought better prices, and cancelled redundant policies. She agreed to have the 2000 Ford Ranger pickup truck titled in her name, apparently to shield Charles from the potential of having his truck seized due to litigation involving a motor vehicle accident. She then paid for insurance for the Ford Ranger from her own personal accounts and accepted reimbursement from Charles. When Ruby's health declined, Allison contacted and worked with various agencies to obtain care for Ruby. As part of this process, Allison went with Charles to his bank, and received $5025 in payment for three months of "home care services." She testified that she did not actually accept this payment but devised the plan to make it appear on paper that Charles had less assets so he and Ruby could qualify for need-based services for Ruby. Finally, Allison testified that she provided companionship for Charles. On the night before he went to sign the quitclaim deed, she

27

stayed up late to talk with him, and she was also up early the next morning to sit with Charles while he ate breakfast. Accordingly, we find that Allison served as Charles's "caretaker."

¶ 94    We finally examine the fair market value requirement. In this case, the parties agree that the property in question is valued in excess of $20,000.

¶ 95    We find that all three elements of the Presumptively Void Transfer Act have been met. The quitclaim deed was a transfer document; Allison served as Charles's caretaker and is not excluded as a family member; and the fair market value of the property exceeds $20,000. For the reasons stated, we conclude that the trial court's judgment that the transfer to Allison violated the Presumptively Void Transfer Act was correct.

¶ 96                                    III. CONCLUSION

¶ 97    For the reasons stated in this order, we affirm the judgment of the Williamson County circuit court.


¶ 98    Affirmed.